UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHANTHILA SOUVANNARATH** | **CIVIL ACTION** |
| **VERSUS** | **No. 25-938-SDD-SDJ** |
| **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, ET AL.** | |

## ORDER

This case comes before the Court on Petitioner Chanthila Souvannarath's Petition for Writ of Habeas Corpus seeking release from the custody of the United States Immigration and Customs Enforcement ("ICE"), asserting that he is, in fact, a U.S. citizen. (Doc. 1). Upon learning that he was soon to be deported, Petitioner sought an injunction to prevent the government from deporting him while his case is litigated. The Court granted a temporary restraining order ("TRO") prohibiting Petitioner's transfer or deportation for a brief period to allow the Court to determine whether an injunction was appropriate. Soon after, however, Petitioner was deported. Before the Court now is Petitioner's Motion to Enforce the Temporary Restraining Order (Doc. 11).

### I.   BACKGROUND

It is a fact that immigration removals are dramatically on the rise. There is at least anecdotal evidence that some of those caught in the ICE removal web are being removed without the benefit of due process. This, however, is not that case. Petitioner in this case was ordered removed from the United States by an Immigration Judge in 2006. (Doc. 23-

1).[1] Whether that final Order of Removal was right or wrong is not before this Court, and this Court lacks jurisdiction to entertain such a claim. Moreover, there is no evidence that the Petitioner ever challenged his final Order of Removal prior to his present assertion of citizenship.[2]

These are the specific facts in this case: Petitioner was born in Thailand and has lived in the United States since infancy. In 2006 an Immigration Judge ordered the Petitioner's removal from the United States. *Supra*, n.1. Petitioner presents no evidence that he challenged the final Order of removal. On June 18, 2025, Petitioner was arrested by ICE agents and detained at ICE detention center at the Louisiana State Penitentiary ("Angola"). On October 16, 2025, after being told that he would be "on the next flight to Laos," Petitioner filed a *pro se* Petition for Writ of Habeas Corpus (Doc. 1) with this Court on October 16, 2025 and an Emergency Motion for Stay of Removal (Doc. 3) on October 17.[3] On October 23, the Court issued an order granting Petitioner's motion in part, issuing a TRO preventing his deportation or transfer for 14 days in order to preserve the status quo while the Court considered a preliminary injunction more fully. ("The TRO", Doc. 4).

On October 28, Petitioner filed the instant Motion to Enforce,[4] informing the Court that Respondents had removed Petitioner from the United States on October 24, the day after the Court entered its TRO. (Doc. 11 at 1). Accordingly, Petitioner asked that the Court

---

[1] A Supervisory Detention and Deportation Officer ("SDDO") issued a Service and Notice to Appear asserting that Petitioner is removable in March 2006. The document is not signed by Petitioner to acknowledge either service or waiver of right to appear. (Doc. 23-1 at 3). An Immigration Judge issued an oral decision in November 2006 ordering Petitioner removed to Thailand or, in the alternative, Laos. (Doc. 23-1 at 4). This document appears to have been personally served on Petitioner, but there is no evidence in the record that service was perfected. (Doc. 23-1 at 5).
[2] There is also no evidence that Petitioner knew he was, indeed, a citizen before now. "U.S. citizens usually know that they're U.S. citizens. But not always." *Garza-Flores v. Mayorkas*, 38 F.4th 440, 442 (5th Cir. 2022) (determining that petitioner, deported and subsequently tried for unlawful reentry, presented a genuine issue of material fact concerning his citizenship claim).
[3] At the time, Petitioner was representing himself, and the Court read this as a motion for preliminary injunction.
[4] Now through enrolled counsel.

enforce its TRO by ordering Respondents to return Petitioner to the U.S. The following day, Respondents filed a notice to the Court asserting that Petitioner had been removed before Respondents received actual notice of the TRO (Doc. 12); and on October 29, Respondents filed a Response to the Motion for Preliminary Injunction (Doc. 15). Later that day, Petitioner filed a single response to both of these filings (Doc. 16).

On October 31, the Court ordered briefing and an evidentiary hearing on the Motion to Enforce to be held on November 5. (Doc. 19). Per the briefing order, Respondents filed an Opposition to the Motion to Enforce on November 3 (Doc. 23), and Petitioner filed a Reply in Support of the Motion on November 4 (Doc. 24). Prior to the hearing, however, Petitioner requested a status conference at which the parties discussed the need for some discovery prior to a hearing on the Motion to Enforce; the Court ordered that the parties conduct limited discovery. (Doc. 26). The Court twice extended the TRO to accommodate discovery, with the TRO ultimately running through December 4. (Docs. 27, 31).

On November 25, a follow-up status conference was held to discuss discovery and whether to move forward with a hearing. The Court ordered supplemental briefing on the Motion to Enforce and briefing on what remedy, if any, might be appropriate. (Doc. 36). The parties agreed to submit the issue on briefings rather than in a hearing (Docs. 38, 39), and so the parties submitted briefs on remedy on December 1. (Docs. 40, 41). The Court now considers the Motion to Enforce (Doc. 11) and all its attendant filings.

## II.     THE TEMPORARY RESTRAINING ORDER

The Court's October 23 TRO was issued "to preserve the status quo until all parties can fully present their arguments on a preliminary injunction". (Doc. 4 at 1). As an initial

matter, the Court has no doubt that it had jurisdiction to issue such an order. Courts have the authority to mitigate "conduct which, left unchecked, would have had the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978). "Status quo orders illustrate this concept well. A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established." *Id.* at n.19. Here, the TRO was expressly intended to press pause—that is, to preserve Petitioner's current status and allow the Court time to assess its jurisdiction and the merits of Petitioner's claims. That Petitioner was removed from the country less than a week after filing his Petition only underscores the necessity of such a judicial pause. Because the status quo was *not* preserved, however, the question now is whether the Court should return Petitioner to his *status quo ante*.[5]

The TRO was issued on October 23, and the next day around 10:45a.m. CDT, Petitioner was on a plane leaving the United States. (Doc. 40 at 2). Respondents did not receive immediate notice of the TRO and only discovered the TRO at 2:51p.m. CDT,[6] some four hours after Petitioner departed the country. (Doc. 40 at 2). At that time, Petitioner's plane was mid-air, but it made stops in Romania, India, Sri Lanka, and Cambodia before reaching Laos, where Petitioner was left on October 26. (Doc. 40 at 3). The plane returned to Louisiana two days later, after a layover in Vietnam. (Doc. 40 at 7).

The timeline is clear: the TRO was violated.

---

[5] The Court notes that through their various filings, the parties have raised both jurisdictional and merits issues that put the cart before the horse. The only question currently before the Court is enforcement of the TRO.
[6] It is important to note that Respondent had not yet been served with the TRO but learned of it only because the AUSA assigned ICE cases was conducting a docket review. (Doc. 23 at 3-4; Doc. 15 at 4).

The Court accepts that Respondents did not know of the TRO prior to Petitioner's departure from the country.[7] Nevertheless, it is undisputed that the TRO was issued on October 23 and Petitioner left the United States at Respondents' behest on October 24. Respondents' lack of intent does not change the simple fact that Petitioner was deported after the TRO was entered.[8] Furthermore, the Court finds unpersuasive Respondents' argument that the TRO was so vague as to preclude compliance,[9] or that logistical hurdles prevented Petitioner's return once he was airborne[10]—neither negates the fact that Petitioner was deported while the TRO was in effect. On the other hand, the Court does not find malice or an attempt to thwart the Court's Order in Petitioner's assertion that Respondents could have returned Petitioner to the United States and failed to do so.[11] (Doc. 35 at 8).

## III.    REMEDY

Having determined that Respondents violated the TRO, even if unwittingly, the Court now turns to remedy. Petitioner argues that the Court has the authority under the All Writs Act, 28 U.S.C. § 1651(a), to order Petitioner's return, release from custody upon return, and to grant declaratory judgment that Petitioner's removal was unlawful. (Doc. 41

---

[7] Petitioner's accounting of the undisputed facts as of the close of discovery do not dispute this. (Doc. 35 at 4-5).
[8] While intent may merit a finding of contempt, no finding of intent is necessary to show that this TRO was violated. And indeed there is no suggestion of contempt here.
[9] Respondents argue that the Court's order that Respondents were "prohibited from removing Petitioner Chanthila Souvannarath from the United States" was overly ambiguous, as it did not define removal. (Doc. 4 at 4). Respondents invite the Court to engage in a granular analysis of the definition of the word "remove" and what it could possibly mean in the context of deportation. (Doc. 40 at 5). The Court need not engage in such an exercise. The Order was clear that its purpose was "to preserve the status quo until all parties can fully present their arguments on a preliminary injunction." (Doc. 4 at 1). The only way to preserve the status quo in this case was to leave Petitioner where he was.
[10] Despite a nearly 48-hour journey to Laos with layovers in four countries for which Petitioner did not have travel documents, Respondents assert that it was impossible for Petitioner to have stayed on the plane ultimately bound to return to Alexandria, Louisiana, because of a 24-hour layover in Vietnam, another country for which Petitioner did not have travel documents. *Omni Air International 3747 Flight Activity History*, FlightAware (Dec. 3, 2025, 10:28 PM), https://www.flightaware.com/live/flight/OAE3747/history.
[11] But again, intent is not at issue here.

at 1). Respondents, on the other hand, argue that the Court lacks jurisdiction to order Petitioner returned because this Court does not have jurisdiction over claims arising from the execution of a final order of removal, this Court does not have jurisdiction to declare Petitioner a U.S. citizen, and this Court's habeas jurisdiction does not extend to Petitioner's removal. (Doc. 40 at 9). The Court will take each of these jurisdictional claims in turn.

First, it is true that this Court has no authority to review a final order of removal—to be clear, "final order of removal" here is used as a term of art in immigration law: an Immigration Judge's order that a person may be deported from the United States. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020) ("The REAL ID Act clarified that final orders of removal may not be reviewed in district courts, even via habeas corpus, and may be reviewed only in the courts of appeals."); 8 U.S.C. § 1252 (stripping jurisdiction over claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders").

Here, Respondents confuse Petitioner's challenge to removal with the Court's undisputed authority to enforce its orders. The Court's TRO did not review, alter, or reverse a final order of removal or to Respondents' decision to execute such an order; indeed, it recognized Respondents' interest in effectuating removal orders. (Doc. 4 at 4). Instead, the TRO would simply have delayed removal by only 2 weeks, [12] and was well within the Court's authority to issue a status quo order, even if it delayed deportation. Likewise, enforcement of the TRO would not be a challenge to the final order of removal,

---

[12] Extended only as a result of Petitioner's actual removal, and still only a miniscule fraction of the 19 years since the final order of removal was issued. (Doc. 40 at 1).

but rather would put Petitioner back in the position he was in before the TRO was violated: in immigration detention, in ICE custody, subject to an order of removal.[13]

Second, it is true that this Court does not have jurisdiction to review the Order of Removal issued by the Immigration Judge in 2006. That is exclusively the purview of the Court of Appeals, and so cannot be a remedy to the violation of the TRO.

Third, Respondents claim that because Petitioner is no longer detained, his habeas claims are moot. (Doc. 40 at 9). The Court feels the need to point out that habeas jurisdiction is determined at the time the petition is filed and is maintained even if the petitioner is transferred out of the Court's jurisdiction or removed from the United States. *Ex parte Endo*, 323 U.S. 283, 304 (1944). The Supreme Court has made it clear that the "in custody" determination is made at the time the habeas petition is filed. *Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004). Furthermore, the Fifth Circuit has held that deportation after a habeas petition is filed does not deprive the courts of jurisdiction when a live case or controversy remains. *Id.* (citing cases). Here, we have not reached the question whether collateral consequences of Petitioner's removal remain,[14] but Respondents' bare assertion that habeas jurisdiction dies upon release from detention does not necessarily apply here.

Finally, we turn to the All Writs Act. Petitioner asks the Court to exercise the authority granted by the Act to return Petitioner to the United States, release him from immigration detention, and declare that his removal was unlawful.[15] The Act provides that

---

[13] As discussed below, however, this would be a futile exercise.
[14] *See Zalawadia*, 371 F.3d at 297-8 ("[T]he bar on readmission of a removed alien is a legally cognizable collateral consequence that preserves a live controversy even after deportation of the petitioner.").
[15] It is not clear exactly what Petitioner seeks in declaratory relief—that removal was unlawful because it violated the TRO, or that removal was unlawful because of Petitioner's claim of citizenship. Certainly this Court does not have jurisdiction to declare the latter.

"all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." This grants the Court the authority to issue, for example, status quo orders in order to properly determine jurisdiction, as discussed above. The Fifth Circuit has explained:

> The All Writs Act also empowers a federal court to employ procedures necessary to promote the resolution of issues in a case properly before it. This power is limited, however, to the facilitation of the court's effort to manage the case to judgment. Thus, it has been held that a court may rely on the Act to issue orders to aid in conducting factual inquiries, *American Lithographic Co. v. Werckmeister*, 221 U.S. 603, 609-10, 31 S.Ct. 676, 55 L.Ed. 873 (1911), or to permit the use of interrogatories in habeas corpus proceedings, *Harris v. Nelson*, 394 U.S. 286, 298-300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). In these cases the Act is said to aid the court in the exercise of its jurisdiction. Consequently, if a court is able to effect a full and complete resolution of the issues before it without resorting to the extraordinary measures contemplated under the Act, then such measures cannot be employed.

*ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978). Here, the purpose of the TRO was to preserve Petitioner's ability to litigate his case, should jurisdiction and the merits warrant that. Of primary concern was Petitioner's ability to litigate his case from abroad, particularly before counsel enrolled on his behalf. This concern indeed followed Petitioner to Laos, as he was detained in jail there and limited to contact with his attorneys only at the whims of prison guards. Now, however, Petitioner has been released from jail in Laos. (Doc. 35 at 4). While the TRO was factually violated and status quo disrupted, the Court—with the benefit of time and Petitioner's changed circumstances—now believes full resolution of this matter in this Court is possible without Petitioner's return. To be clear, the ONLY matter properly before this Court is whether the Petitioner is illegally or unconstitutionally *detained*. There is no habeas relief for removal itself, only for unlawful

detention and its collateral consequences. Because these issues can be resolved without Petitioner's return, the Court should not employ the All Writs Act.

Even if any of the jurisdictional windows discussed above allow the Court to order Petitioner returned to the United States, the practical effect of that return would be futile. Petitioner encourages the Court to "wind back the clock". For the sake of argument, were the Court to wind back the clock by ordering the Petitioner's return to the United he would remain in ICE custody subject to his final order of removal, and the TRO would be in effect for at most 14 days. A preliminary injunction hearing would take place for the Court to decide whether a stay of removal should remain in place through the resolution of this case. "To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that [he] will succeed on the merits, 2) that there is a substantial threat that [he] will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest." *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 789 (M.D. La. 2018) (citing *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993)). Here, Petitioner's habeas claim is based in his claim of U.S. citizenship, which this Court does not have jurisdiction to hear. This jurisdictional issue makes it far less than "substantially likely" Petitioner will succeed on the merits of his habeas claim.[16] And so, in the world where the Court has wound back the clock, it seems more likely than not that a preliminary injunction would be denied, the TRO would expire, and Petitioner would again be subject

---

[16] At this stage of litigation, the Court is not making a merits determination, and there may yet be arguments the Court has not heard. But at the TRO/preliminary injunction stage, the likelihood of success does not appear to rise to the level that would justify a preliminary injunction.

to removal at ICE's whim. The effect of enforcing the TRO now, in these particular circumstances, would only be to shuttle Petitioner back and forth across the world only to end up back in the position he is in now.

## IV. CONCLUSION

For the reasons discussed above, the Court determines that the TRO (Doc. 4) was violated, but the Court declines to further enforce that TRO. As such,

**IT IS ORDERED** that Petitioner's Motion to Enforce the Temporary Restraining Order (Doc. 11) is **DENIED**.

Signed in Baton Rouge, Louisiana, on December 4, 2025.

*Shelly D. Dick*
**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**